UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                            :

GEORGE SALEMO                   :
               Plaintiff,    :
                            :       11 Civ. 2525
          v.              :
                            :      **<u>OPINION</u>**
UNITED STATES SECRET SERVICE  :
AGENT MAUREEN MURPHY, et al.,  :
                            :
             Defendants.  :
                            :
------------------------------------------x

George Salemo, proceeding *pro se*, brings numerous constitutional and other tort claims arising from his investigation and eventual arrest by U.S. Secret Service Special Agent Maureen Murphy, U.S. Department of Agriculture Assistant Special Agent-in-Charge Bethanne Dinkins, and U.S. Probation Officer Marcela Bravo.

Salemo brings this action against several federal officers and agencies.  The action originally included as defendants Warden Hastings of the Metropolitan Correctional Center ("MCC"), the Federal Bureau of Prisons, "United States Marshals Service SDNY," "Chief United States Marshal," Special Agent Murphy, ASAC Dinkins, and Officer Bravo.  The complaint was previously dismissed as to the Federal Bureau of Prisons, Warden Hastings, "United States Marshals

Service SDNY," and "Chief United States Marshal", leaving Special Agent Murphy, ASAC Dinkins, and Officer Bravo as defendants.

The remaining defendants move to dismiss the complaint. Their motion is granted.

## Background

Salemo's complaint provides little context for his allegations but, drawing from the complaint as well as the exhibits attached to Salemo's opposition, a somewhat clearer picture emerges:

Salemo was suspected (and ultimately convicted) of presenting a forged $2.25 Million U.S.D.A. Farm Service Agency grant agreement as collateral for a loan to be paid to the Global Alliance for International Advancement ("GAIA"). Salemo claims that GAIA was a non-profit corporation of which he served as CEO.

But Salemo alleges that defendants pursued their investigation recklessly, repeatedly abusing their powers due to their personal contempt for him. In so doing, the officers are said to have taken and encouraged others to take documents and hard drives from GAIA headquarters without a warrant. Defendants then allegedly replaced Salemo in his role at GAIA with another GAIA employee, Troy Sargent, and then had Salemo locked out of his own offices.  Defendants then allegedly allowed Sargent and others to gain unauthorized access to GAIA's bank accounts.  When Salemo attempted to

initiate civil and criminal proceedings against Sargent and other GAIA employees, he claims that defendants interfered.

Salemo also alleges that defendants orchestrated attacks on his reputation: he claims that they authorized Sargent to contact Salemo's business associates as well as the website Rip-Off Report, informing them that Salemo's enterprises were fraudulent.

This investigation, however, was not Salemo's first legal problem; he had previously been convicted of other financial crimes and was under supervised release when these events took place.  In the course of defendants' investigation, it was discovered that Salemo was violating the terms of his release and he was arrested.  Ultimately, Salemo was sentenced to an additional 15 months in prison for this violation of his supervised release.  And when these 15 months were over, the defendants were ready to arrest him in connection with the fraud they had been investigating.

Therefore, when Salemo was formally released from the MCC, instead of being actually freed as he had expected, he was delivered into the custody of the U.S. Marshals and finally arrested by defendants.  Salemo claims, however, that in the course of his arrest defendants conspired to have him illegally detained for approximately two hours before actually arresting him.

Salemo claims that these events ultimately culminated in GAIA's bankruptcy.  He seeks compensatory and punitive damages in connection with these alleged constitutional violations totaling $55 million.

3

## Procedural History

Salemo initiated this action by filing a form civil complaint on April 6, 2011.  On May 9, 2011, Salemo's claims against the United States Marshalls Service SDNY, the Bureau of Prisons ("BOP"), Warden Hastings, and the "Chief United States Marshall" were dismissed pursuant to 28 U.S.C. § 1915A.

The instant motion to dismiss Salemo's complaint was filed by the remaining defendants on November 30, 2011.  Salemo then, on February 24, 2012, filed his opposition to defendants' motion to dismiss as well as a motion for reconsideration of the May 9, 2011 order dismissing his complaint in part. Defendants replied to Salemo's opposition on March 28, 2012 to which Salemo further replied on July 19, 2012.

Salemo's opposition and reply, however, include allegations not included in his original complaint.  His opposition, in particular, consists of a 36 page statement of facts.  In general, a party is not permitted to use its reply to a dispositive motion as a vehicle for amending its complaint.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir.1998).  And although courts afford *pro se* plaintiffs a fair measure of procedural latitude, see, e.g., Graham v. Lewinsky, 848 F.2d 342, 344 (2d Cir. 1988), this latitude typically does not extend so far as permitting a plaintiff to supplement the claims in his complaint with additional allegations in his motion papers.  See, e.g., Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. Oct 29, 2007).

4

Therefore, though a *pro se* plaintiff's supplemental statement might be considered, the court declines to do so here because it is so excessively lengthy and because it is a confused mixture of claims against federal officers and various private parties not named in the complaint.  A *pro se* plaintiff is certainly entitled to a liberal construction of his pleadings, but Salemo's supplemental statement goes beyond what even a *pro se* plaintiff can be permitted.

Therefore, only the allegations contained in Salemo's April 6, 2011 complaint will be considered on the current motion which is a motion addressed to that complaint.  However, on one point, to be noted later in this opinion, the court will rely on an admission made in Salemo's opposition brief, supported by documents he provides.

## The Complaint

Salemo's complaint presents a lengthy narrative describing numerous alleged constitutional violations and other torts perpetrated against him by defendants.

Salemo's first claim relates to his detention by defendants after he was nominally released from the MCC November 19, 2010, after completing a 15-month sentence for violating the terms of his supervised release.  After signing his release papers, Salemo was informed that he was not in fact free to leave but that, instead, he was to be transported to the courthouse with other

inmates.  He alleges that he was then locked in a room at the MCC for approximately 45 minutes and, after he was transported to the courthouse, held in a cell for another 30 minutes.

Eventually, Salemo was taken to Special Agent Murphy who informed him that he was under arrest.  Generously read, Salemo's complaint alleges that Special Agent Murphy and ASAC Dinkins orchestrated these events with the cooperation of unnamed BOP officials.

Salemo alleges that he was held for a total of approximately two hours, during which time he claims that officers informed him that neither a detainer nor a warrant had been issued for his detention.  The court takes judicial notice, however, that this statement, if it was made, was incorrect: a warrant for Salemo's arrest had indeed been issued the day before.

The next count in the complaint relates to defendants' alleged removal of documents from GAIA offices.  In May 2009 Salemo alleges that a GAIA employee, Troy Sargent, took documents from GAIA offices with defendants' encouragement, and delivered them to defendants.  The defendants then, a few days later, came to the GAIA offices themselves where they interviewed employees and removed additional files, hard drives, and other evidence.

During and subsequent to this search of the GAIA offices, Salemo also claims that GAIA employees looted and vandalized the offices and (with defendants' knowledge) gained unauthorized access to GAIA's online banking accounts.  When Salemo attempted to bring civil and criminal actions against

6

GAIA employees in connection with these events, Salemo claims that defendants interfered by contacting the attorneys involved and claiming to have taken over the cases.  He does not, however, provide any other information about the disposition of these cases.

Additionally, subsequent to the search of the premises, Salemo claims that Special Agent Murphy somehow installed Sargent as a new officer of GAIA (and another organization operating out of the same offices, American Unclaimed Properties, Inc.) and arranged for Salemo to be locked out of the GAIA offices. Salemo claims that not only was he the C.E.O. of GAIA, but that he also had personally guaranteed the lease of the premises.  He does not claim, however, that he was the lessee.

Salemo finally alleges that Sargent, with defendants' authorization, emailed a number of Salemo's business associates alerting them to Salemo's criminal activity and inviting them to contact defendants for more information. Similarly, Salemo alleges that on another occasion, sometime in the first quarter of 2010, defendants in some sense authorized Sargent to make a post on the website Ripoff Report inviting the Internet-browsing public to contact ASAC Dinkins or Special Agent Murphy about Salemo's criminal activity.

Salemo claims that his business, GAIA, has ultimately gone bankrupt as a result of these events.

## Discussion

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Where a plaintiff is proceeding *pro se*, the complaint is held to a less stringent standard, and the court must construe the plaintiff's pleadings liberally. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006). In deciding a motion under Rule 12(b)(6), a court must accept as true the facts alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Though a court ordinarily will not allow a plaintiff to supplement his pleadings through his motion papers in response to a motion to dismiss, the court may take cognizance of admissions made in an opposition brief that are inconsistent with the allegations in the complaint. See, e.g., Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, 03 Civ. 0613, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004); Owens v. Morgan Stanly & Co., Inc., 96 Civ. 9747, 1997 WL 403454 (S.D.N.Y. July 17, 1997).

A motion under Rule 12(b)(6) should be granted where "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

8

Goldman v. Belden, 754 F.2d 1059, 1065 (2d Cir. 1985) (internal quotations omitted).  It should also be granted where an affirmative defense or other reason barring relief is apparent from the face of the complaint.  Conopco, Inc. v. Roll Int'l et al., 231 F.3d 82, 86–87 (2d Cir. 2000).

 As a preliminary matter, the court notes that Salemo describes most of his causes of action as arising under 42 U.S.C. § 1983.  Section 1983, however, provides a remedy only for constitutional violations committed under the color of state law.  It therefore is applicable only to actions taken by state government officials, not federal officers such as defendants.  Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n.4 (2d Cir. 1991).  This is an understandable and easily corrected mistake: the court instead construes Salemo's complaint as a Bivens action, which provides a largely analogous cause of action for constitutional violations perpetrated by federal officials. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).  Because "federal courts have typically incorporated § 1983 law into Bivens actions," none of the substance of Salemo's complaint is likely to be lost in the translation.  See Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995).

 To bring a Bivens suit against a federal official a plaintiff must establish specific facts demonstrating that defendant's personal involvement in the constitutional violations alleged.  See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).  A plaintiff may demonstrate the requisite personal involvement either by proof of the defendant's direct participation in the alleged

violation, or by that defendant's having acted as a supervisory official who either: (a) failed to remedy the violation once it was reported to him; (b) created a policy or custom that gave rise to the constitutional violation or permitted it to endure; or (c) demonstrated gross negligence in managing the subordinates at whose hands the violation occurred.  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995); Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986). The Second Circuit has defined "direct participation" as "personal participation by one who has knowledge of the facts that rendered the conduct illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).

I. ACTIONS AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES

Each of the remaining defendants is a federal official.  However, Salemo does not indicate whether he intends to bring claims against defendants in their official capacities, individual capacities, or both.  It is essential to disambiguate between these possibilities, however, because the law imposes requirements that differ on this basis.

In light of this court's responsibility to read Salemo's complaint liberally, it considers Salemo to have asserted each of his claims against each of the three remaining defendants in both capacities.

However, suits brought against federal officials in their official capacities are, in essence, suits against the United States itself.  And because the doctrine of sovereign immunity prevents courts from exercising subject matter

jurisdiction over the United States itself, suits against officers in their official capacities are typically barred as well.  FDIC v. Meyer, 510 U.S. 471, 475 (1994); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir.1994).  It is true that the United States has consented to be sued in certain circumstances, but the United States has not consented to be held liable for constitutional torts such as those alleged by Salemo.  See Meyer, 510 U.S. at 477-78 (1994).  Therefore, Salemo's claims against defendants in their official capacities are dismissed for lack of subject matter jurisdiction.

The court must still, however, consider Salemo's claims against defendants in their personal capacities.

## II. Removal of Files from GAIA Offices

Salemo contends that the warrantless removal of documents, both by Sargent with defendants' encouragement, and by defendants personally, violated the Sixth and Fourteenth Amendments.  In light of Salemo's *pro se* status, the court not only takes his factual allegations to be true but also endeavors to construe his legal allegations generously.  Thus, the court construes Salemo's charge that these acts violate the Sixth and Fourteenth Amendments as, in fact, presenting a claim under the Fourth Amendment.  For while the court can identify no provision of the Sixth or Fourteenth Amendments that these actions might reasonably be said to violate, they stray

11

much closer to the Fourth Amendment's prohibition of unreasonable searches and seizures.

Defendants argue that, with respect to the receipt of documents provided by Sargent, the Fourth Amendment is inapplicable as well because it proscribes only state action.  However, because Salemo alleges that defendants encouraged Sargent to remove the documents and did not merely receive it, the analysis is not so simple.  See, e.g., United States v. Knoll, 16 F.3d 1313, 1320 (2d Cir.1994) ("The government may become a party to a search through nothing more than tacit approval.")  But there is no need to pursue this line of inquiry further because even assuming, for the sake of argument, that Sargent was acting as an agent of the government when he removed the documents, neither this search nor the search personally conducted by defendants was unreasonable.

Though the existence of a valid warrant is the best known means by which law enforcement may conduct a legal search under the Fourth Amendment, there are also other circumstances that can render a search "reasonable" and, therefore, permissible under the Fourth Amendment.  See U.S. v. Simmons, 661 F.3d 151, 156-57 (2d Cir. 2011).  In the absence of a warrant, a court determines whether a search is reasonable by weighing "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest that is compromised by the search, (3) the character of the intrusion imposed

by the search, and (4) the efficacy of the search in advancing the government interest." Dickerson v. Napolitano, 604 F.3d 732, 750-51 (2d Cir. 2010).

In this case, it appears undisputed that defendants initiated their search of the GAIA offices in order to prevent the possible destruction of evidence. Salemo concedes as much in his opposition to this motion. And preventing the destruction of evidence is a government purpose recognized as justifying an exception to the warrant requirement. See Kentucky v. King, 131 S. Ct. 1849, 1857-58 (2011) ("[W]arrantless entry to prevent the destruction of evidence is reasonable and thus allowed.").

Salemo argues that there was no actual need to prevent him from destroying evidence. The test for reasonableness, however, turns not on the actual likelihood that the evidence would be destroyed, but on the facts as they were knows to the officers conducting the search. "The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." United States v. Klump, 536 F.3d 113, 117–18 (2d Cir. 2008). Salemo does not contend that defendants did not believe that the search was necessary to preserve evidence; in fact, to the contrary, he provides emails sent amongst the officers demonstrating their belief that evidence might be destroyed, and that this belief was reasonably formed in light of warnings they received from multiple GAIA employees.

Thus, with respect to Salemo's constitutional claims relating to the search of and removal of documents from the GAIA offices, defendants' motion to dismiss is granted.

## III. THE LOCKOUT

Salemo also alleges that defendants arranged for him to be locked out of the GAIA offices. He does not, however, identify which provision of the U.S. Constitution this alleged lock-out violates, and the court is not aware that such conduct has ever been recognized to constitute an actionable constitutional violation. However, in light of Salemo's *pro se* status, the court is willing to entertain the possibility (without deciding) that this lock out constituted an unlawful seizure of Salemo's property.

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984). Salemo's complaint may fairly be read as asserting that he held a property interest in the GAIA premises. He alleges, in addition, that Special Agent Murphy was personally involved in excluding him from this property. And while his allegations that this seizure was unreasonable are sparse, he does assert that this was done without a warrant, and defendants for their part have provided no explanation for the lock out. Thus emerge the broad outlines of a possible Fourth Amendment violation.

But in the context of a <u>Bivens</u> action seeking monetary damages from federal officers in their personal capacities, significantly more is required.  A federal officer, sued in her personal capacity, enjoys a qualified immunity from suit such that she cannot be held liable unless a plaintiff can demonstrate the violation of "clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009).  As the court has already remarked, this sort of office lock out appears never to have been recognized as an actionable constitutional violation.  This being the case, it cannot be considered a violation of rights of which a reasonable person would have known.

This conclusion is bolstered by some factual complications.

They were private security officers who physically excluded Salemo from his office, not government officials.  Even if they did so at Special Agent Murphy's suggestion, does this indicate the level of official involvement required for a constitutional violation?  <u>See</u> <u>Jacobsen</u>, 466 U.S. at 113.  ("This Court has also consistently construed this protection as proscribing only governmental action....")

Salemo has alleged that he guaranteed GAIA's lease of the premises and served as its C.E.O.  But if GAIA itself was the actual lessee, does this give rise to the required property interest in Salemo personally?

The court includes these observations not to cast doubt on Salemo's factual assertions (which, at this stage, it must regard as true) but to demonstrate just

15

how unclear the legal issue is.  And, more to the point, they demonstrate just how unclear the legal issue would have seemed to Special Agent Murphy or to any other "reasonable person" at the time.

Therefore the court concludes that even if Special Agent Murphy did violate Salemo's constitutional rights by arranging to lock him out of his office (and it does not conclude that she did), any right that she may have violated was neither clearly established nor one of which a reasonable person would have known.  Therefore, Special Agent Murphy is immune from suit in her personal capacity relating to Salemo's exclusion from his office and, accordingly, this claim is dismissed. See Pearson, 555 U.S. at 231.


IV. Disclosures of Salemo's Criminal Activities

Salemo alleges that defendants violated his constitutional rights (though he does not specify which) when they disclosed, or authorized others to disclose, Salemo's criminal background.

As with the documents removed from GAIA offices, it is far from clear that Sargent's actions were so motivated by defendants' conduct that they might be considered attributable to the state, a prerequisite to finding any constitutional violation.  But as before, we need not pursue this question because, even if Sargent was acting as an agent of the government, there was no constitutional violation.

Quite simply, damage to one's reputation caused by "[d]efamation by the government is not alone a violation of a constitutional right of the defamed person and an action therefor cannot be maintained pursuant to <u>Bivens</u>." <u>McMillan v. Togus Reg'l Office, Dept. of Veterans Affairs</u>, 120 Fed.Appx. 849, 852 (2d Cir. 2007).

Pursuant to the court's duty to read Salemo's *pro se* complaint generously, it must also consider whether it could entertain these allegations as state law defamation claims.  But it could not.  Given the dismissal of all federal claims with which these state law claims share a common nucleus of operative facts, it must dismiss any related state law claim as well for lack of subject matter jurisdiction.  <u>See</u>, <u>Lyndonville Sav. Bank & Trust Co. v. Lussier</u>, 211 F.3d 697 (2d Cir. 2000).

Therefore, defendants' motion to dismiss with respect to these claims is granted and the claims dismissed.


## V. Salemo's Detention by BOP Officers and Subsequent Arrest by Special Agent Murphy

Salemo alleges that his two-hour detention after his release from MCC on November 19, 2010 was a false arrest, a violation of his Fourth Amendment right to be free from arrest without probable cause.

While it is generally the case that, in considering a motion to dismiss, a court must limit itself only to the factual allegations in the plaintiff's complaint,

a court may also take "judicial notice" of certain facts.  Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).  Such matters include facts "generally known within the trial court's territorial jurisdiction" or those that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201. That a warrant was actually issued for Salemo's arrest the day before he was arrested falls comfortably within this definition.  See, e.g., Guerrier v. Quillian, 10 Civ. 9453, 2011 WL 4916295, at *3 (S.D.N.Y. Oct. 14, 2011).

With this additional information at hand, it is clear that Salemo's false arrest claim cannot proceed.  "It is well-established that where an individual's arrest is effectuated pursuant to a warrant, there can be no claim for false arrest."  Williams v. Young, 769 F. Supp. 2d 594, 602 (2d Cir. 2011).  See also, Singer v. Fulton County Sheriff, 63 F.3d 110, 118-19 (2d Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.")

It may be the case that, as Salemo alleges, there were a wide variety of other legal procedures that may have been used to arrest him more efficiently at the MCC.  Salemo has not presented any argument, however, that the Fourth Amendment requires officers to make arrests according to any of these other possible procedures.  It guarantees, in this context, only freedom from unreasonable imprisonment, a right that cannot be infringed by merely an inefficient arrest when it was made pursuant to a valid warrant.

Salemo's claim of false imprisonment in violation of his Fourth Amendment rights must therefore be dismissed.

## VI. GAIA'S BANKRUPTCY

Finally, Salemo claims that his business, GAIA, has gone bankrupt as a result of defendants' behavior and that this is a violation of his constitutional rights.  Salemo does not specify which constitutional provision he believes to be implicated by GAIA's bankruptcy.  But, read generously, Salemo's complaint can be understood to argue that GAIA's bankruptcy amounts to a deprivation of property without due process in violation of the Fifth Amendment.

But, while the Fifth Amendment surely protects business assets and other traditional forms of property, a businessperson has no property interest in the activity of doing business itself.  Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999); see also Olesen v. Morgan, 06 Civ. 959, 2009 WL 2045682, at *6 (N.D.N.Y. July 8, 2009).  Thus, defendants' interference with Salemo's ability to do business is not a constitutionally cognizable injury in itself.  Were it the case that Salemo were able to show that defendants' actions violated his constitutional rights in other ways, it is conceivable that the bankruptcy of his business could be considered in the computation of damages if the violation could be shown to have caused the bankruptcy.  But in fact Salemo has not demonstrated any such constitutional violation.

Salemo's claims arising from the bankruptcy of GAIA is, therefore, dismissed.

## VII. Salemo's Remaining Claims

Salemo also claims that defendants violated his constitutional rights by interfering in ongoing civil and criminal actions against GAIA employees accused of looting and vandalizing GAIA offices, electing a new GAIA CEO, and knowing of Sargent and others' allegedly unauthorized access to GAIA's bank accounts.

In short, the court does not find that any of these allegations adequately specify the nature of defendants' personal involvement.  It is worth repeating yet again that, in light of Salemo's *pro se* status, his complaint is entitled to a generous reading.  See, e.g., Graham v. Lewinsky, 848 F.2d 342, 344 (2d Cir. 1988).  Furthermore, no plaintiff, particularly not a plaintiff proceeding *pro se*, is required to provide "specific facts."  Boykin v. KeyCorp, 521 F.3d 202, 215 (2d Cir. 2008).  Indeed, the court recognizes that "dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."  Id. at 216.

But these three claims rise to this level.

In the case of defendants' alleged interference with the criminal cases, Salemo tells the court only that defendants contacted the law enforcement officers originally investigating his criminal complaints and informed them that

they were taking over the case.  With respect to the civil cases, Salemo alleges only that defendants contacted the lawyers involved.  In neither case does Salemo make any allegations regarding the ultimate fates of these cases, let alone defendants' specific roles in bringing these outcomes about.  On these facts, the court is unable to identify the constitutional provision that defendants are alleged to have violated, let alone their personal roles in the infringement.

The situation is similar with respect to defendants' alleged role in the election of new GAIA corporate officers.  In support of this allegation Salemo pleads only that "these agents, and in particular Maureen Murphy with the security manager of the building actually elected a new officer...."  The court is unsure what Salemo means by this allegation.  In the state of New York a new corporate officer can, of course, only be appointed by a corporation's board of directors or in accordance with other procedures specified in its bylaws. N.Y.C.L. § 715.  Perhaps defendants could have purported to have elected a new corporate officer.  But, if so, Salemo has not provided the factual basis for this allegation with sufficient clarity for the court to assess its legal sufficiency, much less to provide defendants a fair opportunity to respond.  Salemo has also not suggested any particular constitutional provision that this activity would violate.  While the court has labored to identify the strongest legal arguments supportable by each of Salemo's claims, it is aware of none that

could be supported by the facts as Salemo provides them with respect to this claim.

Finally, Salemo's allegation that defendants knew GAIA employees were gaining unauthorized access to GAIA bank accounts is insufficient to sustain a Bivens claim.  A non-supervisory government official's mere knowledge of the actions of private individuals, without any participation of their own, is simply not enough.  Bivens liability is only available for officials who either became involved through their supervision of subordinate officers, or who participated directly themselves.  See Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986).  And "direct participation" means "personal participation by one who has knowledge." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001).  Here Salemo has alleged knowledge, but not participation.

## Conclusion

Defendants' motion to dismiss is granted and, accordingly, Salemo's complaint is dismissed in its entirety.  Salemo's Motion for Reconsideration is denied.

This opinion resolves the motions listed under document numbers 20 and 30 on the docket of case 11 Civ. 2525.

So ordered.

Dated:  New York, New York
        September 27, 2012

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 27, 2012

Thomas P. Griesa
U.S. District Judge